# United States Court of Appeals
## For the First Circuit

No. 15-2224

JOSEPH MCGUNIGLE,

Plaintiff, Appellant,

v.

CITY OF QUINCY; PAUL KEENAN;
JOHN DOUGAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

Brian Rogal, with whom Rogal & Donnellan, P.C. was on brief, for appellant.
John R. Hitt, with whom Cosgrove, Eisenberg and Kiley, P.C. was on brief, for City of Quincy, and individual appellees, in their official capacities.
Geoffery P. Wermuth, with whom Murphy, Hesse, Toomey & Lehane LLP was on brief, for individual appellees in their individual capacities.

August 31, 2016

**THOMPSON**, **Circuit Judge**.    Plaintiff-appellant Joseph McGunigle (McGunigle), a former Quincy police officer, brought this action against the City of Quincy, Chief of Police Paul Keenan (Chief Keenan), and Captain John Dougan (Captain Dougan) (collectively, appellees), claiming, among other things, that appellees retaliated against him for protected speech in violation of his First Amendment rights.    The district court granted appellees' motion for summary judgment.    After careful consideration, we affirm.

## I.    BACKGROUND

As required when reviewing an order granting summary judgment, we summarize the facts in the light most favorable to the non-moving party — here, McGunigle.    Del Valle-Santana v. Servicios Legales De P.R. Inc., 804 F.3d 127, 128 (1st Cir. 2015).

### A. The Long Road to Here

This case has a long, circuitous history.    It begins in 2006 with a neighborhood disagreement about leash laws, and culminates a decade later with alleged witness intimidation. Because this history provides essential context for our decision, it is necessary for us to go into some detail here.    Bear with us.

### B. McGunigle's Dog Ordinance Crusade

In the fall of 2006, McGunigle and his wife, Dianne McGunigle (Dianne), bought a waterfront home in Quincy, Massachusetts.    Purchasing an oceanfront house had been a life-

long dream of the McGunigles. Unfortunately, after moving in, they began witnessing multiple violations of Quincy's dog ordinances. The ordinances require dog owners to keep their dogs leashed and to clean up after them, but apparently were not readily enforced on the beach across from their house. McGunigle claims that his neighbors frequently "allowed their dogs to roam the neighborhood" and to defecate on the beach. Tensions between McGunigle and his neighbors over the dog ordinances escalated, finally coming to a head in early 2007 when an unleashed Great Dane attacked McGunigle's dog, and an unleashed Golden Labrador attacked his wife and "lunged" at a woman holding her six-month-old child.

In response to the later incident, a "dog hearing" was held at the Quincy Police Department. As best we can tell, this hearing was essentially a neighborhood mediation, facilitated by Captain Dougan. McGunigle was allowed to attend the hearing, but only if he changed out of his police uniform since he was not representing the police department at the hearing. He declined to change and did not attend. His wife, Dianne, did go and testified, along with other members of the community. At the conclusion of the hearing, the Golden Labrador's owner agreed to keep her dog on an expandable leash and to enroll him in dog training courses.

Apparently unhappy with the outcome of the hearing, McGunigle went to Captain Dougan's office "shortly after" to speak

with him about the ordinance issue. McGunigle wanted to show Captain Dougan a videotape that, he claimed, disproved the testimony of some of his neighbors at the hearing as to whether the Golden Labrador was let off its leash. Captain Dougan declined to watch the video, and told McGunigle that it was too late to present additional evidence because the hearing was over. During this conversation, McGunigle was in uniform and on duty.

Frustrated by the continued lack of enforcement of the dog ordinances, the McGunigles continued their campaign against what they perceived to be a policy of non-enforcement. They reported violations of the dog ordinances to Quincy Animal Control Officer Don Conboy, and wrote numerous letters to the Mayor of Quincy, various city councilors, and the press, expressing their concerns. By May 2007, McGunigle had decided to take matters into his own hands, and he began issuing citations for violations of the dog ordinances to a number of his neighbors. Most of the neighbors who received citations from McGunigle had testified adversely to his wife at the hearing. The citations were issued by McGunigle in his capacity as a Quincy police officer.

McGunigle's neighbors complained to the then-Chief of the Quincy Police Department, Robert Crowley. Chief Crowley ordered McGunigle to stop writing dog-ordinance citations to his neighbors and while off-duty. McGunigle initially complied with the order. But about a month later, McGunigle started issuing

- 4 -

citations anew, which prompted his neighbors to again voice complaints to police leadership about McGunigle's harassment. For example, one neighbor, who received a citation after walking her dog on private property, called Captain Dougan in tears explaining "that she felt that Officer McGunigle was using his authority to intimidate her." Another neighbor claimed that she received a citation from McGunigle for having her dog unleashed "but at the time the ticket was written [she] was at work and [her] dog was home all day." After receiving these complaints, Chief Crowley suspended McGunigle for five days for insubordination for violating his order to stop issuing citations.

In support of McGunigle, the union challenged his suspension, arguing that Chief Crowley's order was unlawful because it ran afoul of McGunigle's oath to enforce city ordinances. An arbitrator ultimately concluded that there was not just cause to discipline McGunigle because the City of Quincy failed to respond to the union's inquiry into the lawfulness of the order. Accordingly, the arbitrator vacated the suspension, finding that McGunigle could not be suspended "for violation of an order whose lawfulness had not been determined before [he] was suspended."

By early September 2007, the press had picked up on the growing controversy. On September 15, 2007, WHDH Channel 7 News aired a television report about the dog ordinances, the lack of

enforcement, McGunigle's crusade, and his suspension. During the broadcast, McGunigle was shown making the following statement: "I'm just doing my job, you know, trying to make the neighborhood safe and, uh, enforcing some violations down there to make it cleaner." He later added: "We're not quitting; we're just beginning to fight." McGunigle was off-duty, in plain clothes, and was standing in front of his house when he was interviewed. But when the first statement aired, the screen caption read "Officer Joseph McGunigle, Quincy Police Dept."

A little over a week later, the Boston Globe ran a story on McGunigle's dispute with his neighbors. Identifying McGunigle as a Quincy police officer, the article reported that McGunigle had "issued about 11 citations, with fines of $50 to $100" to his neighbors, and credited McGunigle with declaring that the dog ordinance violations have been tolerated for years and that he "won't put up with it." McGunigle was quoted as saying that he had "paid $620,000 for [his] oceanfront home" and that he was "not letting dogs [defecate] on [his] yard." (second alteration in original). The article also reported allegations by McGunigle's neighbors that he was harassing and intimidating them. One neighbor was quoted as saying that he was issued a citation even though he did not own a dog (his girlfriend did). The article noted that McGunigle had "acknowledge[d] videotaping" his neighbors, tearing down a neighbor's fence when he realized it was

- 6 -

on his property, and that he had previously been suspended from the police force. But the article also highlighted that McGunigle had defenders in the community, who agreed that "the dog problem . . . had gotten out of hand." The paper painted McGunigle as "unrepentant," crediting him with saying that "he was only enforcing the law and has done nothing wrong."[1]

In the wake of all this publicity, the Quincy Sun reported that the Mayor of Quincy, William Phelan, had approached McGunigle's wife, Dianne, and told her to "drop" the dog-ordinance issue and to "let it go." Nevertheless, Mayor Phelan later held a public meeting to address the issue. The public meeting was attended by 60 members of the community and several other public officials. The upshot of this meeting is not set out in the record. Nor does the record reflect the ultimate resolution of the dog ordinance controversy. Nearly a year later, Chief Crowley retired and, in July of 2008, Paul Keenan was promoted to Chief of Police.

## C. End of the Line: Traffic Cones and Witness Intimidation

Three years after Chief Keenan was promoted, and four years after the dog-ordinance controversy and publicity

---

[1] Although the articles themselves are not contained in the record, McGunigle acknowledged that, around the same time as the Boston Globe coverage, the Patriot Ledger and the Quincy Sun ran similar articles regarding the dog ordinance controversy, but McGunigle did not recall if he made any comments to those papers.

surrounding it, McGunigle once again found himself in a dispute with a neighbor, Michelle Webber.[2]  On July 30, 2011, McGunigle pulled up in front of her house — in his police car and wearing his uniform — and confiscated traffic cones from her driveway. McGunigle believed that these traffic cones belonged to National Grid and were stolen.  In fact, the traffic cones belonged to Webber and she had placed them there to stop people from turning around in her driveway (she lives at the end of a dead end street). When Webber tried to explain that she owned the traffic cones, she

_____

[2] All did not go smoothly for McGunigle in the intervening years.  To begin with, a year after Chief Keenan took over from Chief Crowley, McGunigle's brother was involved in an altercation and was criminally charged as a result.  As a consequence, McGunigle missed several days of work and, to justify his absence, he submitted a doctor's note, explaining that he was having "a mental health issue."  Upon receiving this note, Chief Keenan promptly placed McGunigle on paid administrative leave, and ordered him to surrender his firearm and undergo a psychiatric evaluation.  While on paid leave and waiting for the evaluation, McGunigle was not allowed work details or overtime.  In an effort to get him reinstated immediately, McGunigle's doctor wrote several follow-up notes to Chief Keenan, clarifying that McGunigle's absence "was not due to a personal mental health issue," and opining that he could "return to work."  McGunigle eventually submitted to the ordered psychiatric evaluation, and once he was cleared, Chief Keenan reinstated McGunigle immediately.

Then, six months later, McGunigle's wife suffered a heart attack, and McGunigle requested leave.  He was granted three months under the Family Medical Leave Act (FMLA), but when his leave expired McGunigle did not return to work. Because McGunigle failed to provide any updates, he was not granted an extension of his FMLA leave and his continued absence was considered unexcused sick time.  Once McGunigle returned to work, the leave issue was "straightened out" and all of McGunigle's accrued vacation and sick time was restored.

claims McGunigle looked at her in "an intimidating fit of rage" and told her that he was taking the cones "before someone [got] arrested!"

Webber, who had previously received citations from McGunigle during the dog ordinance brouhaha, filed a citizen complaint regarding the incident in which she claimed that "McGunigle was coddling his gun" while talking to her and that she "believe[d] that [her] life was in danger." Webber added that she was "very concerned for [her] well being, knowing that [] McGunigle [was] carrying a loaded weapon," and that she had previously witnessed "McGunigle's inability to control his rage and anger" and his "harassment and intimidation" of "the whole community."

According to the police report following-up on Webber's complaint, multiple witnesses to the exchange noted that the cones were clearly on Webber's property, and that McGunigle was "abrasive, loud, and argumentative" during the encounter. These witnesses echoed Webber's statements, describing McGunigle as "very threatening," and explaining that his "hostility" "caused them concern." One witness added that McGunigle "carrying a gun was '[s]cary.'"

In the aftermath of the traffic cone incident, McGunigle was suspended pending an investigation. Chief Keenan ordered McGunigle to turn in his firearm and to stay away from the Quincy police station. On October 17, 2011, during the ongoing cone

investigation, and while McGunigle was suspended and subject to the stay-away order, Webber visited the station to apply for a firearms license. Minutes after she arrived, McGunigle pulled up in front of the station. According to McGunigle, he wanted to use the ATM machine in the lobby. Knowing that McGunigle was suspended because of the complaint filed by Webber, a lieutenant quickly escorted Webber to the records room so that she and McGunigle would not run into each other. When Webber was told that McGunigle had come to the station while she was there, she "became visibly upset and shaken" and the lieutenant had to take her to Chief Keenan's office "to calm her down" before she could depart.

The lieutenant later explained that he thought McGunigle had followed Webber to the police station, and that McGunigle's presence there was part of "a pattern of intimidation and harassment." Based on this new incident, Chief Keenan charged McGunigle with additional, separate violations for, among other things, willfully violating the stay-away order and intimidating a witness.[3]

_____

[3] Around the same time, while the initial cone-incident charges were still pending, McGunigle requested his personnel file. In response, McGunigle was provided with a file containing only four pieces of paper. Believing that he was being denied access to his file, he lodged a complaint with the Attorney General's Office. He was then informed that Chief Keenan "was in the process of giving all [his] files to the union attorney." Eventually, McGunigle's complete personnel file was provided to the union attorney, and McGunigle reviewed it in late October 2011.

An appointing authority held hearings on the cone incident on November 2, November 21, and December 20, 2011. The hearing officer found that McGunigle had violated the Department's personal conduct policy and recommended that the new Mayor of Quincy, Thomas P. Koch, affirm a five-day suspension without pay. In addition, the hearing officer recommended that "McGunigle be suspended for a period of up to thirty days . . . and ordered to Anger Management Training." On March 9, 2012, Mayor Koch accepted the recommendation.

Soon thereafter, on March 12, 2012, Chief Keenan revoked McGunigle's license to carry because he had come to believe that McGunigle "was unfit to carry a firearm." This revocation decision was based, in part, on the hearing officer's findings from the cone incident and, in part, on Chief Keenan's belief that McGunigle had intentionally harassed and intimidated Webber. Consequently, on April 23, 2012, Chief Keenan recommended McGunigle's immediate termination, explaining that he "deemed [McGunigle] to be unfit to be a City of Quincy Police Officer, and an unsuitable person to carry and possess a firearm." Additionally, he requested that the second Webber-incident be reviewed by the appointing authority and that a disciplinary hearing be held to consider McGunigle's termination.

The same day Chief Keenan revoked McGunigle's license to carry a firearm, the Patriot Ledger newspaper ran an article about

- 11 -

McGunigle's suspension. In a section describing the "traffic cone" incident, Chief Keenan was quoted as saying: "His version differed considerably from all of the eyewitness versions . . . [u]ntruthfulness for a police officer is a serious infraction."

Two weeks later, Chief Keenan was quoted in another Patriot Ledger article. The article explained that Chief Keenan had filed a new complaint against McGunigle, alleging that McGunigle had disobeyed a direct order to stay away from the police station while out on administrative leave. Chief Keenan was quoted as saying: "Basically, he walked to the ATM, but I don't believe he conducted business . . . . We don't believe that he had a legitimate purpose to be in there. I believe it was in an effort to intimidate a witness in the previous disciplinary actions." In a follow-up article that ran in advance of the hearing, the Patriot Ledger quoted the Chief as saying: "In my 29 years on the force, there's been nothing like this that I can remember."

A hearing on the second Webber incident was held on May 18, 2012, and on June 12, 2012, the hearing officer recommended McGunigle's termination. In a written decision, concurring with Chief Keenan that McGunigle had "exhibited an inability to conform to the standards of the Quincy Police Department," the hearing officer concluded that McGunigle's insubordination in refusing to obey the stay-away order, in conjunction with McGunigle's

"extensive" disciplinary record,[4] "warrant[ed] termination in and of itself." In particular, the hearing officer found that it was "more likely than not" that McGunigle was either "actually following" Webber or that he saw her enter the police station and was attempting to harass or intimidate her. The hearing officer also found that termination was supported because McGunigle had lost his license to carry, which is a condition of employment, and because he intimidated a witness (Webber), who had filed a complaint against him. After receipt of the hearing officer's decision, Mayor Koch terminated McGunigle's employment effective immediately.

McGunigle promptly sought judicial review of the revocation of his firearm license. But, on December 4, 2012, the Quincy District Court upheld the revocation, concluding that "the revocation of McGunigle's license to carry a firearm [was] supported." The state court judge added that it was reasonable for Chief Keenan to "have found that McGunigle was a person who . . . was out of control and who reflected poor decision making" and that "[w]hen all [his] behavior [was] pieced together, including the lobby incident, it was reasonable for [Chief] Keenan to conclude that McGunigle's behavior was . . . an escalation of

---

[4] Between 1998 and 2011, McGunigle faced multiple disciplinary violations, however, the exact contours of all these violations are not divulged in the record.

- 13 -

improper behavior and that the revocation of his firearms license was needed to ensure safety."  The Massachusetts Superior Court subsequently affirmed the district court's decision, concluding that "[g]iven the numerous complaints from neighbors and other citizens about McGunigle's threatening or harassing behavior and the allegation from a neighbor that he used his service weapon on at least one occasion to give further weight to a threat. . . [Chief] Keenan had reasonable grounds for revoking McGunigle's [license to carry]."[5]  See McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 167 (D. Mass. 2015).

On January 27, 2013, an arbitrator, acting on a union grievance, affirmed McGunigle's termination, explaining that the loss of his license to carry provided the city with just cause to terminate him.  The arbitrator made clear, however, that he "lack[ed] the authority to reconsider the wisdom of . . . Chief Keenan's revocation action."

---

[5] McGunigle did not appeal the Massachusetts Superior Court decision.  See Mass. Gen. L. c. 140, § 131(f); see also e.g., Mazurczyk v. Chief of Police of Chelmsford, No. 14-P-369, 2014 WL 6994664, at *1 (Mass. App. Ct. Dec. 12, 2014) (reviewing District and Superior Court decisions and considering whether "the chief acted within the authority granted by G.L. c. 140, § 131, to determine individual suitability to carry a firearm").

- 14 -

## D. Relevant Federal District Court Proceedings

McGunigle then brought the action at issue here against the City of Quincy, Chief Keenan, and Captain Dougan, alleging that he was retaliated against for exercising his First Amendment rights by making statements to various news organizations in 2007 regarding the dog-ordinance issue. McGunigle also brought a claim for defamation against Chief Keenan based on the statements he made to the press in advance of McGunigle's termination hearing.

After various proceedings, not relevant here, appellees moved for summary judgment on all of McGunigle's remaining claims: (1) a First Amendment retaliation claim under 42 U.S.C. § 1983; (2) a claim under the Massachusetts Civil Rights Act (MCRA), Mass. Gen. L. c. 12 § 11I, against Chief Keenan and Captain Dougan in their individual capacities; and (3) a claim for defamation against Chief Keenan. The district court granted the motion, concluding that McGunigle could not show a § 1983 retaliation claim because his "relatively weak" interest in commenting on the dog-ordinance issue did not outweigh "the strong interests of the Quincy Police Department in maintaining obedience, loyalty, discipline, and the perception of fairness." McGunigle, 132 F. Supp. 3d at 173. Moreover, the district court found the evidence "insufficient to support a claim of a causal connection between the speech and the alleged retaliation" and that "[e]ven if there were a constitutional violation, [Chief] Keenan and [Captain] Dougan

- 15 -

would be entitled to qualified immunity, because objectively reasonable officials would not have understood under the circumstances that the conduct at issue could have violated McGunigle's constitutional right to free speech." Id. at 176.

As a result, the district court concluded that McGunigle could not establish a claim under the MCRA against Chief Keenan and Captain Dougan because they did not interfere with McGunigle's "exercise or enjoyment of rights secured by the Constitution or the laws of the United States or the Commonwealth." Id. at 177 (quoting Bally v. Ne. Univ., 532 N.E.2d 49 (Mass. 1989)). The district court also concluded that McGunigle could not maintain a defamation claim against Chief Keenan for statements that appeared in the 2012 newspaper articles because "none of the quotes from [Chief] Keenan are capable of defamatory interpretations." Id. at 180. McGunigle timely appealed.

## II. DISCUSSION

Before us, McGunigle argues that the district court erred in granting summary judgment on his First Amendment claims because (1) when he made the 2007 statements to the press regarding the dog-ordinance issue he was speaking as a private citizen on a matter of public concern; (2) his interest in commenting on the dog-ordinance issue outweighed his employer's interests; and (3) there is sufficient evidence in the record to permit a jury to find that his protected speech was a substantial motivating factor

- 16 -

in his termination.  He also argues that there is sufficient evidence of threats against him to sustain his MCRA claim. Finally, McGunigle argues that his defamation claim against Chief Keenan was improperly dismissed because Chief Keenan's statements "were clearly defamatory."[6]

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Our review is de novo, and we examine the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Del Valle-Santana, 804 F.3d at 129.  We are not bound by the district court's reasoning and we may "affirm the entry of summary judgment on any ground apparent from the record." Rodriguez-Sanchez v. Municipality of Santa Isabel, 658 F.3d 125, 129 (1st Cir. 2011).

## A. Section 1983 Retaliation Claim

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Mercado-Berrios v. Cancel-Alegría, 611 F.3d 18, 25 (1st Cir. 2010)

---

[6] McGunigle also makes a confusing, throwaway argument that appellees' claim that they were not motivated by McGunigle's speech necessarily forecloses Chief Keenan's and Captain Dougan's qualified immunity defense.  Because we do not reach the merits of the parties' qualified immunity arguments, we do not attempt to tease out this argument.

(omission in original) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). This rule holds true in public employment as well, but "in recognition of the government's interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." Id. at 26; see also Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

To succeed on his § 1983 First Amendment retaliation claim, McGunigle must establish that: (1) he was speaking "as a citizen on a matter of public concern"; (2) his interests, "as a citizen, in commenting upon matters of public concern" outweighed his employer's interest "in promoting the efficiency of the public services it performs through its employees"; and (3) "the protected expression was a substantial or motivating factor in the adverse employment decision." Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) (quoting Curran v. Cousins, 509 F.3d 36, 44-45 (1st Cir. 2007)). Even if all three inquiries are resolved in McGunigle's favor, "the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct." Id. (quoting Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 765-66 (1st Cir. 2010)).

The district court bypassed step one and proceeded to step two, determining that McGunigle's claim failed at the second

step.[7] McGunigle, 132 F. Supp. 3d at 173. Specifically, the district court concluded that McGunigle's interest in commenting on the dog-ordinance issue did not outweigh his employer's interests "in maintaining the obedience and loyalty of its police officers" and "in setting enforcement priorities and ensuring that those priorities are implemented in a fair and sensible manner." Id. at 172-73; see also Decotiis, 635 F.3d at 35 (explaining that at step two the court must apply the Pickering test, which "balance[s] the value of an employee's speech -- both the employee's own interests and the public's interest in the information the employee seeks to impart -- against the employer's legitimate government interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission'" (quoting Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003)). But because, as we explain below, we conclude that McGunigle has failed to offer any evidence demonstrating a causal connection between his speech and the adverse employment

---

[7] At the first step, we, like the district court, are skeptical that McGunigle was acting as a private citizen. His statements to WHDH Channel 7 News and to the Boston Globe that he was "just doing [his] job," and that "he was only enforcing the law" certainly give the impression that he was speaking as a police officer and not as a citizen. See Foley v. Town of Randolph, 598 F.3d 1, 6 (1st Cir. 2010) (explaining that "when public employees make statements 'pursuant to their official duties,' they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline" (quoting Garcetti v. Ceballos, 547 U.S. 421 (2006)).

actions, we will not tarry at step one or two, but will proceed directly to the third step of the retaliation inquiry -- causation.

As noted above, to succeed on his First Amendment retaliation claim, McGunigle must introduce sufficient evidence to allow a finding that his speech "was a substantial or motivating factor behind the adverse employment action." Guilloty Perez, 339 F.3d at 55. Although McGunigle may rely on circumstantial evidence to make this showing, he must produce some facts linking his employer's adverse employment actions to his protected conduct. Id. at 55-56. "If [McGunigle] succeeds in establishing this causal relationship, the burden of persuasion shifts to the defendants to prove . . . that the adverse employment action would have been taken 'even in the absence of the protected conduct.'" Id. at 56 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

McGunigle argues, in essence, that he produced sufficient circumstantial evidence to show that, after he spoke out about the police department's failure to enforce the dog ordinances, Chief Keenan had it in for him. McGunigle claims that Chief Keenan employed "a pattern of serious, unsupported adverse employment actions" to punish him for speaking out. Although McGunigle seemed to concede at oral argument that the only potentially actionable adverse employment actions were Chief Keenan's 2012 revocation of his license to carry and McGunigle's

- 20 -

subsequent termination, McGunigle points to a variety of other allegedly harassing incidents as evidence of Chief Keenan's animus.[8]  Most concretely, McGunigle relies on Chief Keenan's 2009 order that McGunigle surrender his firearm and undergo a psychiatric evaluation, and the Department's handling of his FMLA leave as evidence of Chief Keenan's harassment (see footnote 2).

But even assuming, favorably to McGunigle, that Chief Keenan's requirement that McGunigle undergo a psychiatric evaluation and his handling of the FMLA leave amounted to adverse employment actions in the § 1983 context,[9] Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (explaining that "the 'adverse employment action' inquiry in the section 1983 context focuses on whether an employer's acts, viewed objectively, place substantial pressure on the employee's political views" and noting that "[a]

---

[8] McGunigle argues that the jury could also consider, as evidence of Chief Keenan's harassment: (1) Chief Keenan's statement in a deposition that he agreed with Chief Crowley's order to stop issuing citations; (2) an unsupported allegation that Chief Keenan had personal animosity towards McGunigle; (3) the fact that Chief Keenan admitted at the deposition that he had seen the WHDH Channel 7 news report; and (4) the fact that McGunigle's personnel file contained copies of the dog ordinance newspaper articles.

[9] We note that these allegedly harassing incidents were eventually resolved without detriment to McGunigle.  Once he returned to work, McGunigle's FMLA leave was recognized and his sick time restored.  And McGunigle admits that Chief Keenan "had the right to require [] McGunigle to submit to a mental health examination" after receiving a note from McGunigle's personal physician declaring that McGunigle was having "a mental health issue."

campaign of informal harassment . . . would support a First Amendment retaliation claim if the alleged harassment would have [] a chilling effect"), McGunigle points to nothing linking these incidents to his protected speech.  He simply argues that they must have been in retaliation for his speech because they happened afterwards.

McGunigle admits, however, that for the purposes of his First Amendment claim his only relevant speech was in the fall of 2007.  In other words, McGunigle acknowledges that there was a temporal gap of at least two years between his speech and the first allegedly harassing incident -- Chief Keenan's requirement that McGunigle submit to a psychiatric evaluation -- and a gap of over five years between his protected speech and the loss of his license to carry and his discharge.  McGunigle does not answer for this causation gap, which, standing alone, is too long to support an inference of a causal connection between his speech and the adverse employment actions absent other evidence of improper motive.  See, e.g., González-Droz v. González-Colón, 660 F.3d 1, 17 (1st Cir. 2011) (finding that "an interval of [fourteen months] cannot establish the necessary linkage between protected speech and some challenged action"); Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003) (finding that a temporal gap of "over a year and a half before [the plaintiff] was terminated . . . seriously undermines his temporal proximity argument").

Any inference that McGunigle's speech was the motivating factor behind Chief Keenan's revocation of his license to carry and his termination is further undermined by the fact that Chief Keenan was not even the Chief at the time of the protected speech. McGunigle offers no explanation of why Chief Keenan would retaliate against him for actions that occurred a year before he became Chief, and the record similarly provides no insight.

On the other hand, the record suggests, even when viewed favorably to McGunigle, that Chief Keenan's concerns about McGunigle's temperament were reasonable. As discussed above, in the lead up to McGunigle's termination, Chief Keenan received numerous complaints about McGunigle's handling of the traffic cone incident. Multiple witnesses claimed that McGunigle had been "abrasive, loud, and argumentative" during his interactions with Webber. One witness, who actually described himself as a "friend" of McGunigle's, added that McGunigle having or "carrying a gun was 'scary.'" Webber echoed these concerns in her citizen complaint, explaining that she felt unsafe around McGunigle and was "very concerned for [her] well being, knowing that [] McGunigle [was] carrying a loaded weapon."

Against this backdrop, it was certainly reasonable for Chief Keenan to be concerned about McGunigle's fitness to carry and possess a firearm. And whatever McGunigle's subjective intentions, when McGunigle then disobeyed Chief Keenan's stay-away

order and followed Webber into the police station, it was similarly rational for Chief Keenan to worry that McGunigle was intentionally harassing and intimidating her. Indeed, when the Quincy District Court upheld the revocation of McGunigle's firearm license, it unambiguously concluded that it was reasonable for Chief Keenan to "have found that McGunigle was a person who . . . was out of control and who reflected poor decision making." Furthermore, the record supports the inference that McGunigle's behavior may have been escalating, and McGunigle has presented no probative evidence demonstrating that Chief Keenan's stated reasons for revoking his license to carry were pre-textual.

Piecing all of McGunigle's behavior together, then, not only has McGunigle failed to establish a causal connection between his protected speech and the adverse employment actions, but appellees have met their burden to show that they would have taken the same adverse employment actions regardless of McGunigle's 2007 speech. See Guilloty Perez, 339 F.3d at 56 (noting that "[i]f the plaintiff succeeds in establishing this causal relationship, the burden of persuasion shifts to the defendants to prove 'by a preponderance of the evidence' that the adverse employment action would have been taken 'even in the absence of the protected conduct.'" (quoting Lewis, 321 F.3d at 219 and Mt. Healthy, 429 U.S. at 287). We therefore conclude that McGunigle's § 1983 First Amendment retaliation claim fails at the summary judgment stage.

## B. MCRA Claim

Having found that McGunigle has proffered insufficient facts to survive a motion for summary judgment on his § 1983 claim, we can make short work of his MCRA claim against Chief Keenan and Captain Dougan in their individual capacities. To prevail, McGunigle must show that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Bally, 532 N.E.2d at 51–52 (quoting Mass. Gen. L. c. 12, § 11H). For the reasons discussed in some detail above, we conclude that Chief Keenan and Captain Dougan did not interfere with McGunigle's "exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth." Id.

Moreover, we agree with the district court that McGunigle has failed to identify threats, intimidation, or coercion by Chief Keenan or Captain Dougan sufficient to give rise to an MCRA claim. See Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994) (explaining that "threat" "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; "intimidation" "involves putting in fear for the purpose of compelling or deterring conduct"; and "coercion" involves "the application to

- 25 -

another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done").  McGunigle points to only one comment by either Chief Keenan or Captain Dougan that he claims rises to the level of threats, intimidation, or coercion: an alleged January 2009 statement by Captain Dougan to a union representative that if McGunigle did not "watch himself," he was "gonna get canned."[10]

This single alleged comment -- made not to McGunigle, but to a third-party -- is likely insufficient to sustain McGunigle's MCRA claim.  Regardless, as the district court noted in an earlier Rule 12(b)(6) proceeding, the statute of limitations for McGunigle's MCRA claim is three years, see Flynn v. Associated Press, 519 N.E.2d 1304, 1305 (Mass. 1988), and therefore any "retaliatory acts that took place prior to May 11, 2009 are untimely and no longer actionable," McGunigle v. City of Quincy, No. 12-10852-JLT, 2013 WL 3892901, at *2 (D. Mass. July 25, 2013).

---

[10] McGunigle also points to Mayor Phelan's reported comment to McGunigle's wife that she should "drop" the dog-ordinance issue and "let it go."  But we are unsure how Mayor Phelan's statement amounts to threats, intimidation, or coercion by Chief Keenan or Captain Dougan.  And we do not see how Mayor Phelan's reported statement to McGunigle's wife equals an interference with McGunigle's exercise or enjoyment of rights secured by the federal or state constitution by threats, intimidation, or coercion.

Accordingly, we conclude that McGunigle's MCRA claim also fails at the summary judgment stage.[11]

## C. Defamation Claim

Finally, McGunigle argues that his defamation claim against Chief Keenan was improperly subjected to summary judgment because Chief Keenan's statements to the press in the wake of the traffic cone incident "were clearly defamatory."

To succeed on his defamation claim, McGunigle must show that: (1) Chief Keenan "made a statement, concerning [McGunigle], to a third party"; (2) "the statement was defamatory such that it 'could damage [McGunigle's] reputation in the community'"; (3) Chief Keenan "was at fault in making the statement"; and (4) the statement caused McGunigle to suffer either "economic loss . . . or is actionable without proof of economic loss." Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003)). And because police officers are "public officials" for the purposes of a defamation action, McGunigle cannot recover on his defamation claim unless he also "proves by clear and convincing evidence that [Chief Keenan] made the false statement with actual malice." Rotkiewicz v. Sadowsky, 730 N.E.2d 282, 287, 289 (Mass. 2000). This means that McGunigle

---

[11] Because we conclude that McGunigle's § 1983 retaliation claim and MCRA claim fail, we need not address the parties' qualified immunity arguments.

must show that Chief Keenan "published" the defamatory statement with "knowledge that it was false or reckless disregard of whether it was false." Id. at 289 (quoting Stone v. Essex Cty. Newspapers, Inc., 330 N.E.2d 161, 173 (Mass. 1975)). It is McGunigle's burden to prove that the "allegedly defamatory statement[s are] materially false." Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003).

McGunigle relies on two Patriot Ledger articles to support his defamation claim. First, McGunigle points to the March 12, 2012, article where Chief Keenan is quoted as saying that McGunigle's "version [of the cone incident] differed considerably from all of the eyewitness versions" and that "[u]ntruthfulness for a police officer is a serious infraction." Next, McGunigle points to the March 21, 2012, article concerning the revocation of McGunigle's license to carry due to allegations that he intimidated Webber. In that article, Chief Keenan is quoted as saying that "[b]asically [McGunigle] walked to an ATM, but I don't believe he conducted business . . . . We don't believe that he had a legitimate purpose to be in there. I believe it was in an effort to intimidate the witness in the previous disciplinary case."[12]

---

[12] In the district court, McGunigle relied on an additional defamatory statement: a May 2, 2012 article about McGunigle's termination hearing where Chief Keenan is quoted as saying "[i]n my 29 years on the force, there's been nothing like this that I can remember." The district court concluded that the statement was merely "an example of 'rhetorical hyperbole'" and that it could

- 28 -

McGunigle argues that these statements were defamatory and that Chief Keenan knew them to be false. But to succeed on his defamation claim, McGunigle must proffer "sufficient evidence to permit the conclusion that [Chief Keenan] in fact entertained serious doubts as to the truth of his [statements]." Stone, 330 N.E.2d at 173. This is an entirely subjective inquiry, Rotkiewicz, 730 N.E.2d at 289, and McGunigle points to nothing in the summary judgment record that suggests Chief Keenan made these statements knowing that they were false or with reckless disregard for their truth or falsity. See id. at 287.

To the contrary, as discussed in some detail above, the evidence suggests that Chief Keenan reasonably believed that McGunigle was lying about the cone incident and about intentionally harassing Webber -- remember: Chief Keenan had previously charged McGunigle with untruthfulness about the cone incident; the cone incident eye-witness statements, if not considerably different from McGunigle's version of events, at least tended to corroborate Webber's version; the lieutenant who witnessed the second Webber incident also thought that McGunigle had followed Webber to the police station as part of "a pattern of intimidation and harassment"; and the second hearing officer similarly concluded

---

not "form the basis for a defamation claim." McGunigle v. City of Quincy, 132 F. Supp. 3d 155, 179 (D. Mass. 2015). McGunigle does not renew this claim on appeal.

- 29 -

that McGunigle was likely attempting to harass or intimidate Webber.

Viewing the record as a whole, then, it is clear that the allegedly defamatory statements reflect Chief Keenan's honest belief that McGunigle had been untruthful and that he had intimidated a witness, and McGunigle has offered no evidence that Chief Keenan believed any of the statements' implied facts to be false, or that Chief Keenan recklessly disregarded any actual facts.  See Rotkiewicz, 730 N.E.2d at 289.  We therefore agree with the district court that no genuine issue of material fact exists as to whether Chief Keenan's statements were defamatory.

## III.   CONCLUSION

For the reasons articulated above, we affirm.  Costs to appellees.