REC'D CUMB CLERKS OFC
OCT 4 '23 PM 1:24

STATE OF MAINE                                           SUPERIOR COURT
CUMBERLAND, ss                                           CIVIL ACTION
                                                         DOCKET NO. CV-22-30


MARK J. ROBERTS,

    Plaintiff,

    v.                                   **ORDER ON MOTION**
                                                         **FOR SUMMARY JUDGMENT**
STATE OF MAINE DEPARTMENT OF
PUBLIC SAFETY and JOSEPH E.
THOMAS,

    Defendants.

## INTRODUCTION

Before the court is the Defendants Maine Department of Public Safety and State Fire

Marshal Joseph Thomas's (individually "DPS" and "Thomas," collectively "Defendants")

Motion for Summary Judgment. Defendants seek summary judgment on all of Plaintiff Mark

Roberts's ("Roberts") remaining claims. Roberts brings a 42 U.S.C. § 1983 claim of First

Amendment retaliation against Thomas and a claim of retaliation under the Maine Human Rights

Act (MHRA) and the Whistleblower Protection Act (WPA) against DPS. Roberts alleges, in

essence, that he was passed over for promotion at the Office of the State Fire Marshal in

retaliation for engaging in protected activities. For the reasons discussed below, Defendants'

motion is GRANTED in part and DENIED in part.

## FACTS

The record reflects the following facts, undisputed unless otherwise noted.

Roberts is employed as a Senior Fire Investigator in the Office of the State Fire Marshal

("FMO") Investigations Division. (Defs.' S.M.F. ¶¶ 1, 3, 5.) The Investigations Division of the

FMO is divided into three regional offices for the Northern, Central, and Southern regions of

Maine. (Defs.' S.M.F. ¶ 3.) Each regional office is staffed with one sergeant and four investigators. (Defs.' S.M.F. ¶ 4.) At all times relevant to this matter, Roberts was assigned to the Southern Division. (Defs.' S.M.F. ¶ 5.)

I.      Roberts's advocacy for L.D. 1480.

In late 2018 into early 2019, Roberts proposed and found sponsorship for a bill ("L.D. 1480") to modify Maine's retirement program for fire investigators. (Defs.' S.M.F. ¶ 6.) The bill's aim was to reduce the risk of FMO employees developing cancer. (Pl.'s Add'l S.M.F. ¶ 3.) Roberts told Thomas about the bill, and Thomas seemed disinterested in Roberts's work on the bill. (Defs.' S.M.F. ¶ 7.) On April 22, 2019, Roberts testified before a legislative committee in support of L.D. 1480. (Defs.' S.M.F. ¶ 8.) Roberts's colleagues, Senior Fire Investigator John Wardwell ("Wardwell") and Senior Fire Investigator Edward Archer ("Archer") also advocated for passage of L.D. 1480. (Defs.' S.M.F. ¶¶ 9-10.)

The Maine Department of Administrative and Financial Services ("DAFS") prepared a fiscal note to the bill indicating that the FMO had an unencumbered[1] fund balance of approximately $2 million and the bill would cost $1 million to fund. (Defs.' S.M.F. ¶ 12.) Roberts and Archer met with Thomas in early June 2019 to inquire about the FMO providing funding for the bill. (Defs.' S.M.F. ¶ 13.) The parties dispute the extent to which Thomas was upset about the bill's impact on the FMO's budget, who his feelings were directed at, and how long Thomas remained upset. (Defs.' S.M.F. ¶ 15; Pl.'s Add'l S.M.F. ¶¶ 5-13; Defs.' Reply S.M.F. ¶¶ 5-8, 10-13.) During the meeting between Thomas, Roberts, and Archer in early June 2019, Thomas responded to the fiscal note and the request for funding that "the ladies at DAFS

---

[1] Defendants' Statement of Material Facts, admitted by Roberts, states that the fund balance was "encumbered," but the material cited in the record states that the fund balance was "unencumbered." (Defs.' S.M.F. ¶ 12; Pl.'s Opp. S.M.F. ¶ 12; Ex. 15, ¶ 8.) The court has treated the inconsistency between the statements of material facts and the record as a typo.

2

need to keep their fingers out of [the FMO's][2] cookie jar." (Defs.' S.M.F. ¶ 14; Pl.'s Add'l S.M.F. ¶ 6.) Thomas was upset with DAFS for stating that the FMO had the money to fund the bill without first discussing the issue and the potential impact on the FMO budget with him or the DPS Commissioner, Michael Sauschuck ("Sauschuck"). (Defs.' S.M.F. ¶ 15.)

At this meeting, Thomas also told Archer and Roberts that Thomas did not have the money in his budget to fund L.D. 1480 and that Archer and Roberts should have a bake sale to fund the bill. (Pl.'s Add'l S.M.F. ¶ 9.) The parties dispute Thomas's tone during this conversation; Roberts perceived Thomas's tone as hostile, while Archer's impression was that Thomas was trying to be humorous. (Pl.'s Add'l S.M.F. ¶ 8; Defs.' Reply S.M.F. ¶ 8.) Thomas ended the conversation by saying that he would not authorize the expenditure of any of his budget to fund L.D. 1480.[3] (Pl.'s Add'l S.M.F. ¶ 9.)

Roberts emailed Sauschuck to ask about FMO funding for the bill on June 12, 2019. (Defs.' S.M.F. ¶ 17.) Archer also called Sauschuck in mid-June 2019 to ask whether the FMO account could fund the bill. (Defs.' S.M.F. ¶ 18.) Sauschuck, Thomas, and Janet Joyeux ("Joyeux"), Assistant to the Commissioner, reviewed the financial status of the FMO account and agreed that the one-time payment required to support L.D. 1480 was feasible. (Defs.' S.M.F. ¶ 19.) Sauschuck called Archer back later that day and confirmed that he would authorize the funding from the FMO account. (Defs.' S.M.F. ¶ 20.)

On June 27, 2019, the day of the ceremonial bill signing for L.D. 1480, Thomas told Archer and Roberts that all his[4] money was gone. (Pl.'s Add'l S.M.F. ¶ 11.) Following the

---

[2] The parties dispute the exact language Thomas used to express ownership of the "cookie jar" of FMO funds. Defendants assert that Thomas said "our cookie jar." (Defs.' S.M.F. ¶ 14.) Roberts asserts that Thomas called it "my cookie jar." (Pl.'s Add'l S.M.F. ¶ 6.)

[3] Only the Commissioner of the DPS can authorize the expenditure of FMO funds; the Fire Marshal does not have the authority to commit FMO funds for legislation, nor do Roberts or Archer. (Defs.' S.M.F. ¶ 16.)

[4] The parties dispute whether Thomas used profanity when he made this statement. (Pl.'s Add'l S.M.F. ¶ 11; Defs.' Reply S.M.F. ¶ 11.)

3

disbursement of the funds, the balance in the FMO account was approximately $1.2 million. (Defs.' S.M.F. ¶ 23.) Although the disbursement from the FMO account did not cause the FMO any financial hardship,[5] (Defs.' S.M.F. ¶ 22,) Roberts's perception was that Thomas was very unhappy about the effect that L.D. 1480 had on the FMO's budget. (Pl.'s Add'l S.M.F. ¶ 12.) Over the years, Roberts had found Thomas to be personable and generally pleasant to be around, but after the passage of L.D. 1480, Roberts found that Thomas was no longer pleasant to be around and Roberts didn't get a very warm feeling from Thomas. (Pl.'s Add'l S.M.F. ¶ 13.)

II. The MacMaster Promotion

On October 1, 2019, the FMO posted a vacancy for a Fire Investigations Supervisor (sergeant) for the Northern Division. (Defs.' S.M.F. ¶ 24.) The interview panel consisted of Thomas, Lt. David Tripp of the Maine State Police, and Dorothy Bonsant, FMO paralegal. (Defs.' S.M.F. ¶ 25.) In his cover letter accompanying his application, Roberts stated:

> I understand the current opening is in Northern Maine and I want to be transparent with my intentions. I am not currently in a position where I am able to move from my current location but am very interested in the position and the process, as well as the outcome. I am confident that I am well-suited to lead the people of our investigations division and if the promoting authority is willing to consider an organizational or structural realignment to allow for my appointment, I would be grateful for the opportunity to serve as a sergeant if so chosen.

(Defs.' S.M.F. ¶ 26.)

The parties dispute the existence and formality of a residency requirement and the role the alleged residency requirement played in the hiring decision on the October 1, 2019 vacancy posting for the Northern Division sergeant position. (Defs.' S.M.F. ¶¶ 27-31; Pl.'s Opp. S.M.F. ¶¶ 27-31.) It is undisputed that there was at least an expectation that the candidate hired as

---

[5] Roberts denies that the disbursement did not cause the FMO any financial hardship, but the record material cited by Roberts refers to Thomas's impression of the budget impacts before the meeting between Thomas, Sauschuck, and Joyeux in which they agreed the one-time disbursement was feasible. (Pl.'s Opp. S.M.F. ¶ 22; Dep. Joseph E. Thomas, Jr. ("Thomas Dep.") 23:4 – 28:11.) Because the Defendants' statement that the disbursement did not cause the FMO any financial hardship has not been properly controverted, Defendants' statement at ¶ 22 is deemed admitted. M.R. Civ. P. 56(h)(4).

sergeant for the Northern Division would reside in the Northern Division, but this was an unwritten expectation that was not always strictly enforced.[6] (Defs.' S.M.F. ¶¶ 27-28; Thomas Dep. 38:11 – 42:2; Ex. 43; Dep. Edward Archer ("Archer Dep.") 23:23 – 24:24.)

During Roberts's interview for the Northern Division sergeant position, it is undisputed that Roberts brought up the topic of his residence, which was located outside of the Northern Division. (Defs.' S.M.F. ¶ 29; Pl.'s Opp. S.M.F. ¶ 29; Dep. of Mark J. Roberts ("Roberts Dep.") 17:17 – 20:12; Aff. David W. Tripp ("Tripp Aff.") ¶ 6; Aff. Dorothy A. Bonsant ("Bonsant Aff.") ¶ 4.) It is further undisputed that Roberts said he was not able to move to the Northern Division at the time of his interview. (Defs.' S.M.F. ¶ 30; Pl.'s Opp. S.M.F. ¶ 30, Roberts Dep. 20:13 – 20:18; Tripp Aff. ¶ 6; Bonsant Aff. ¶ 4.) However, the parties do dispute whether Roberts left open the possibility of relocating in the future and the significance attached to Roberts's statements that he was not in a position to move at the time of his interview. (Defs.' S.M.F. ¶¶ 30, 33; Pl.'s Opp. S.M.F. ¶¶ 30, 33; Roberts Dep. 20:13 – 20:18; Tripp Aff. ¶ 6; Bonsant Aff. ¶ 4.) Lt. Tripp noted his impression from the interview that Roberts understood that his inability to move would probably make him ineligible for the position. (Defs.' S.M.F. ¶ 33.)

The parties dispute whether Roberts stated that he was participating in the interview process only for the experience and did not wish to be considered for the Northern Division vacancy. (Defs.' S.M.F. ¶ 31; Pl.'s Opp. S.M.F. ¶ 31; Thomas Dep. 46:1 – 49:19; Aff. Mark Roberts ("Roberts Aff.") ¶¶ 3-4.) Roberts did not discuss his ideas regarding a potential

---

[6] Defendants argue that Roberts is bound by the allegation in his complaint that historically there was a residency requirement for sergeants because allegations made in a complaint are binding judicial admissions. (Defs.' Reply Mem. Supp. Mot. Summ. J. 1-4.) It is true that "'a party's assertion of fact in a pleading is a judicial admission by which it is normally bound throughout the course of the proceeding,'" *Bahre v. Liberty Group, Inc.*, 2000 ME 75. ¶ 15, 750 A.2d 558 (quoting *Schott Motorcycle Supply, Inc. v. Am. Honda Motor*, 976 F.2d 58, 61 (1st Cir. 1992)). However, Roberts's statement that there was no requirement listed in the job posting or written policy is not necessarily inconsistent with Roberts's allegation that there was a "historical[] . . . requirement."

5

organizational or structural realignment to accommodate his residence outside the Northern Division during the interview. (Defs.' S.M.F. ¶ 32.)

Following the interviews for the open sergeant position, the panel unanimously ranked Roberts as the top candidate. (Defs.' S.M.F. ¶ 34.) Panel members Tripp and Bonsant ranked Senior Fire Investigator Mary MacMaster ("MacMaster") as second. (Defs.' S.M.F. ¶ 35.) Thomas ranked Archer as second. (Defs.' S.M.F. ¶ 36.)

Thomas could select any of the top three candidates. (Pl.'s Add'l S.M.F. ¶ 14.) Following the interviews, Thomas wrote a hiring justification memo to Human Resources ("HR"), along with a summary of the non-selected candidates. (Defs.' S.M.F. ¶ 38.) In the justification memo, Thomas stated that "it was clear that Sr. Inv. Mark Roberts was the top choice. However, Sr. Inv. Roberts wished not to be considered for the Northern Division," and in the summary, Thomas stated that Roberts "wished not to be considered do [sic] to the location."[7] (Defs.' S.M.F. ¶ 39.) Thomas selected MacMaster for the promotion. (Pl.'s Add'l S.M.F. ¶ 15.) MacMaster was promoted to sergeant for the Northern Division effective January 2, 2020. (Defs.' S.M.F. ¶ 43.) MacMaster resided in Central Maine at the time. (Defs.' S.M.F. ¶ 44.)

Thomas called Roberts to notify him that the panel had unanimously ranked him as the top candidate, but that he had not been selected. (Defs.' S.M.F. ¶ 40.) It is undisputed that the reason given to Roberts for his non-selection was related to the position being located in Northern Maine. (Defs.' S.M.F. ¶ 40; Pl.'s Opp. S.M.F. ¶ 40.)

Thomas told Archer that MacMaster finished first in the interview, Archer finished second, Roberts finished third, and another candidate finished fourth. (Pl.'s Add'l S.M.F. ¶ 20.)

---

[7] Thomas's statements in the justification memo are considered part of the record on summary judgment because the fact that he made these statements is not disputed. (Pl.'s Opp. S.M.F. ¶ 39.) However, these statements are not considered for the truth of whether Roberts wished not to be considered for the position because Roberts vigorously denies that he made any statements that he did not wish to be considered. (Roberts Aff. ¶ 4.)

6

Thomas said nothing to Archer about Roberts withdrawing from the process. (Pl.'s Add'l S.M.F. ¶ 21.) Archer and Roberts first discussed the possibility of retaliation in or around January of 2020, at which time Roberts thought that MacMaster's promotion over Roberts and Archer was related to their advocacy for L.D. 1480.[8] (Pl.'s Add'l S.M.F. ¶ 29.)

It was generally assumed that either Roberts or Archer would get the promotion. (Pl.'s Add'l S.M.F. ¶ 16.) Archer lived in the North, had prior supervisory experience, and was very capable. (Pl.'s Add'l S.M.F. ¶ 17.) Roberts had eleven years' experience at the FMO compared to MacMaster's seven; Roberts had seven years' experience as a Senior Fire Investigator compared to MacMaster's two; Roberts had twelve years of state seniority compared to MacMaster's nine; Roberts had at least five years' experience as a firefighter/EMT while MacMaster had no fire department experience; and Roberts had a bachelor's degree while MacMaster did not have a degree. (Pl.'s Add'l S.M.F. ¶ 18.)

Sometime between January and March 2020, the sergeant for the Southern Division, Ken Grimes ("Grimes") announced that he would be retiring in July. (Defs.' S.M.F. ¶ 45.) Following Grimes's announcement of his upcoming retirement, Thomas did not push his expectation that MacMaster relocate to the Northern Division.[9] (Defs.' S.M.F. ¶ 46.) Thomas anticipated that following Grimes's retirement, there would be a potential opportunity for transfers for the other two sergeants. (Defs.' S.M.F. ¶ 47.)

---

[8] The parties agree that Archer told Roberts and other coworkers that Thomas told Archer that Thomas had to promote MacMaster because Thomas could not take on the personal or professional liability of not promoting MacMaster. (Pl.'s Add'l S.M.F. ¶ 27; Defs.' Reply S.M.F. ¶ 27.) The parties dispute whether Archer told Roberts and other coworkers that Archer interpreted Thomas's statement to mean that it was about gender. (Pl.'s Add'l S.M.F. ¶ 28; Defs.' Reply S.M.F. ¶ 28.) Because both of Archer's statements are hearsay and do not fall into any hearsay exceptions, these statements are not considered part of the record on summary judgment because they would not be admissible at trial in the form presented in the summary judgment record (Roberts Dep.). See M.R. Civ. P. 56(e). Archer's statements are considered for non-hearsay purposes, i.e. the effect of the statement on the listener, but not for the truth of the matter asserted.

[9] Roberts denies that there was an expectation that MacMaster would relocate to the Northern Division. (Pl.'s Opp. S.M.F. ¶ 46.)

7

Sauschuck and Thomas met with Sergeant Joel Davis ("Davis") (Central Division) and MacMaster to discuss options for the vacant Southern sergeant position and to float the question of whether either of them would be interested in transferring to the Southern Division. (Defs.' S.M.F. ¶ 56.) MacMaster expressed her interest in transferring to the Southern Division on July 30, 2020. (Defs.' S.M.F. ¶ 57.) On July 31, 2020 Sauschuck reported to the Maine State Law Enforcement Association ("MSLEA") (Executive Director Dan Tourtelotte ("Tourtelotte") and President Archer) that he had floated the question to the sergeants about transfers, that MacMaster had expressed interest and Davis had not yet responded, and that he would let MSLEA know his decision early the following week. (Defs.' S.M.F. ¶ 58.) Thomas did not push his expectation that MacMaster move to the Northern Division at that point because Sauschuck was still considering options regarding filling the Southern sergeant position following Grimes's retirement. (Defs.' S.M.F. ¶ 59.)

III.     Roberts's MSLEA Grievance

Prior to June of 2020, Roberts told Tourtelotte that he thought he was passed over for the promotion because of his work of L.D. 1480. (Pl.'s Add'l S.M.F. ¶ 33.) On or about July 21, 2020, Roberts sent an email to Tourtelotte seeking guidance on whether he should include in his forthcoming grievance the potential presumed motivation of retaliation for sweeping nearly one million dollars from the FMO account against Thomas's will. (Pl.'s Add'l S.M.F. ¶ 34.) On August 5, 2020, MSLEA served a grievance on behalf of Roberts regarding his non-selection for the Northern Division sergeant position, along with a cover email from Tourtelotte asking Sauschuck to contact him to talk. (Defs.' S.M.F. ¶ 60.)

Roberts's grievance stated in part:

The week of November 21, 2020 [sic], Sr. Inv. Roberts sat for an interview for the Northern Division Sergeant. During the interview, Sr. Inv. Roberts truthfully reported to the interview panel that he could not move to the Northern Division

8

but wanted to be considered and suggested arrangements could be made to realign resources if needed to make it work.

On December 13, 2020 [sic], Sr. Inv. Roberts was called by Chief Thomas and advised that he had not been selected for the sergeant promotion because he did not, and was not willing, to move and live in the Northern Division of the state. During this conversation Sr. Inv. Roberts was advised that he was very clearly the first choice of the interview board to be selected and that he was the only candidate who received unanimous votes from the panelists to be selected. However, because Sr. Inv. Roberts was honest in his statement to the board that he could not move, he was eliminated from the selection process because the selected candidate was to be required to live within the boundaries of the Northern Division.

. . . .

Investigator Dave Henderson reported to Sr. Inv. Roberts that during a conversation leading up to the promotional process Chief Thomas told him that the "Northern sergeant would be required to live in the Northern Division."

(Defs.' S.M.F. ¶ 62.) Roberts's grievance did not reference his work on L.D. 1480 or contain any allegation of protected class discrimination or retaliation by anyone. (Defs.' S.M.F. ¶ 63.)

Roberts presumed that MacMaster had lied to Thomas during the promotional process and told him she would move, gambling on the next opening that she could transfer into. (Defs.' S.M.F. ¶ 64.) In an email Roberts wrote to Tourtelotte and MSLEA's attorneys on October 7, 2020 regarding the hiring process and his grievance, he stated:

[I]t was widely known that the selected candidate would be required to live in/move to the northern division which she never did. So she certainly cannot be disciplined for not moving but she knew based on the organization's history and known expectations for the position, that the newly promoted person was to live in northern Maine and she manipulated the system to avoid that. She gambled that she could transfer before they forced her to move. I guess time will tell if that gamble paid off.

(Defs.' S.M.F. ¶ 65.) In the same email, Roberts also stated "I just don't want/can't work in the Northern Division without a divorce." (Defs.' S.M.F. ¶ 66.)

When Sauschuck first contacted Tourtelotte after service of the grievance, Sauschuck told Tourtelotte that the situation described in the grievance was basically messed up and that

9

Sauschuck was going to try to fix it. (Pl.'s Add'l S.M.F. ¶ 31; Dep. Daniel Tourtelotte ("Tourtelotte Dep.") 35:9 – 36:6.) Tourtelotte had discussions with Sauschuck and HR Director Sue Bell, during which Tourtelotte proposed resolving the grievance by promoting Roberts into the open sergeant position in the Southern Division. (Defs.' S.M.F. ¶ 67.) During these discussions, it came out that Roberts believed he did not get promoted because of his advocacy for L.D. 1480. (Pl.'s Add'l S.M.F. ¶ 32.)

FMO sergeant positions are covered by the Maine Service Employees Association ("MSEA") collective bargaining agreement. (Defs.' S.M.F. ¶ 68.) Sauschuck did not and does not have the authority to appoint someone to a vacant sergeant position without first holding a competitive process or reaching an agreement for a placement with the MSEA. (Defs.' S.M.F. ¶ 69.)

On October 15, 2020, Sauschuck and HR Director Deb Phillips met with Tourtelotte and MSEA representative Frank Porter to discuss options regarding Roberts's grievance and the vacant Southern Division sergeant position to attempt to reach a fair resolution for both Roberts and MacMaster. (Defs.' S.M.F. ¶ 70.) MSEA representative Porter would not agree to a resolution that involved placing Roberts into the vacant Southern sergeant position. (Defs.' S.M.F. ¶ 71.)

Roberts's grievance was denied by letter from HR Director Phillips on December 17, 2020, because MSLEA has no standing to grieve a promotional process involving a position that is outside its own collective bargaining agreement. (Defs.' S.M.F. ¶ 72.)

IV.     Gardner's Hiring and Archer's Promotion

Lt. Troy Gardner ("Gardner") started work with the FMO as Assistant Fire Marshal on November 1, 2020. (Defs.' S.M.F. ¶ 73.) After Gardner started with the FMO, Thomas was no longer responsible for hiring sergeants or for providing direct supervision to the sergeants in the

10

Investigations Division.[10] (Defs.' S.M.F. ¶ 74.) Immediately after he began work, Gardner discussed FMO operational issues, including the assignment of personnel within the Investigations Division and the historical (but unwritten) residency expectation for sergeants with Thomas and Sauschuck. (Defs.' S.M.F. ¶ 75.)

On November 13, 2020, Thomas circulated a draft residency work rule to Sauschuck and Gardner. (Defs.' S.M.F. ¶ 76.) Gardner ultimately concluded that continuing with a residency requirement would severely limit the pool of candidates for sergeant positions and the FMO's ability to hire the best qualified supervisors for the Investigations Unit given that each region staffs only four fire investigators and candidates outside of their assigned regions are frequently unwilling or unable to relocate. (Defs.' S.M.F. ¶ 77.) Sometime between November 13 and November 20, 2020, Gardner decided to eliminate the residency expectation. (Defs.' S.M.F. ¶ 78.) Thomas was not a part of the decision to eliminate the residency expectation.[11] (Defs.' S.M.F. ¶ 79.) Instead of transferring to the Southern Division, MacMaster decided to continue as sergeant for the Northern Division but was not required to reside within the Division. (Defs.' S.M.F. ¶ 80.)

On December 7, 2020, the FMO posted a vacancy for a Fire Investigations Supervisor (sergeant) for the Southern Division. (Defs.' S.M.F. ¶ 81.) Thomas was not involved in the hiring process and had no input regarding who was selected for the position, but Gardner did inform Thomas of the selection as a courtesy. (Defs.' S.M.F. ¶ 83; Dep. Lt. Troy A. Gardner ("Gardner Dep.") 45:17 – 46:1; Thomas Dep 69:19 – 70:6.) Archer was selected for the

---

[10] Roberts denies that Thomas was no longer responsible for hiring after Gardner began as Lieutenant, and points to the fact that Gardner sent promotion justification memos to Thomas before the memos were sent to HR as evidence of this. (Pl.'s Opp. S.M.F. ¶ 74; Thomas Dep. 71:1 – 71:5; 71:20 – 72:4.) The evidence in the record establishes that Thomas was informed of the sergeant hiring process, not that Thomas remained responsible for it. As such, this evidence fails to properly controvert Defendants' Statement at ¶ 74 and it is deemed admitted. M.R. Civ. P. 56(h)(4).

[11] Roberts denies Defendants' statements at ¶¶ 77-79 on the basis that there was no residency requirement. As discussed above at n.6, the existence of an unwritten residency expectation is undisputed.

11

Southern Division sergeant position. (Defs.' S.M.F. ¶ 84.) Roberts does not contend that the selection of Archer in the promotional process was retaliatory and thinks that Archer's promotion was justified. (Defs.' S.M.F. ¶ 87.) Archer was promoted to sergeant for the Southern Division in January 2021. (Defs.' S.M.F. ¶ 88.)

V.    Roberts's Maine Human Rights Commission Complaint

Roberts filed a complaint of discrimination with the Maine Human Rights Commission ("MHRC") on or about February 10, 2021. (Defs.' S.M.F. ¶ 91.) On March 22, 2021, the State acknowledged its receipt of Roberts's MHRC complaint. (Pl.'s Add'l S.M.F. ¶ 39.) On or about April 26, 2021, DPS filed its response to Roberts's MHRC Complaint. (Pl.'s Add'l S.M.F. ¶ 40.)

In an email Roberts wrote to Tourtelotte on January 12, 2021, shortly before filing his complaint with MHRC, Roberts stated with respect to the MacMaster promotion, "I was doing some review in my brain about where it all started and although I think it's about sex discrimination, I can better explain the fact that Joe Thomas was asked to provide funding and declined." (Defs.' S.M.F. ¶ 89.) Roberts also had written in his personal journal on October 28, 2020:

> I spoke with Darcy last night about work and got her thoughts. I was surprised when she said that I was a victim of sex discrimination. She explained that it sounds like the only reason Mary was promoted was because she is a woman. What that means is the ONLY reason I was not promoted was because of my sex.

(Defs.' S.M.F. ¶ 90.) Roberts thought it was awkward for him, as a man, to complain about sex discrimination but he respected Darcy and valued her opinion. (Pl.'s Add'l S.M.F. ¶ 36.)

VI.    The Wardwell Promotion

MacMaster transferred from the Northern Division to the Central Division in early April 2021 after the retirement of Davis in March. (Defs.' S.M.F. ¶ 92.) Following MacMaster's

12

transfer, Archer was given the option of transferring to the Northern Division, but he decided to remain in the Southern Division. (Defs.' S.M.F. ¶¶ 93-94.)

On or about April 16, 2021, the FMO posted a vacancy for a Fire Investigations Supervisor (sergeant) for the Northern Division. (Defs.' S.M.F. ¶ 96.) Five candidates were selected for interviews, which were held on May 14, 2021. (Defs.' S.M.F. ¶ 97.) The interview panel consisted of Gardner, Lt. Darrin Crane ("Crane") of the Maine State Police, and Lt. Brian Harris ("Harris") of the Maine State Police. (Defs.' S.M.F. ¶ 98.) Neither Crane nor Harris was aware of Roberts's pending MHRC complaint during the hiring process. (Defs.' S.M.F. ¶ 99.) Roberts does not believe that either Crane or Harris would have been biased against him. (Defs.' S.M.F. ¶ 100.) Thomas was not involved in the hiring process and had no input regarding who was selected for the position, although Gardner did inform Thomas of his selection and sent him the job justification memo as a courtesy. (Defs.' S.M.F. ¶ 101; Gardner Dep. 46:8 – 46:18; Thomas Dep. 72:2 – 72:9.)

The panel considered each candidates' performance at the interview, which counted for approximately sixty percent of the criteria in the selection process. (Defs.' S.M.F. ¶ 103.) Gardner also used the following criteria to evaluate the candidates: years of State service, years of law enforcement experience, education, management and supervisory experience, and financial and budgetary experience, along with past performance evaluations. (Defs.' S.M.F. ¶ 104.) Wardwell had fourteen years of State service (six years with the FMO and eight years with the Maine Drug Enforcement Agency (MDEA));[12] almost eighteen years of law enforcement experience (including MDEA and FMO); an Associate of Arts degree in fire sciences and was enrolled in a Bachelor of Science in Criminal Justice degree program and an electrician

---

[12] Roberts disputes that Wardwell's experience with the MDEA counts toward Wardwell's years of State service but did not cite a source in the record that explains how or why that is the case. (Pl.'s Opp. S.M.F. ¶ 105.) Because the fact of Wardwell's State service is not properly controverted, it is deemed admitted. M.R. Civ. P 56(h)(4).

13

technology program; supervisory experience as a Site Safety Officer for Clandestine Laboratory Scene Management for the MDEA; experience managing two businesses in the private sector;[13] completed FBI LEEDS three-week leadership training program; and four years of experience working as a volunteer firefighter and EMT. (Defs.' S.M.F. ¶ 105). Roberts had fourteen years of State service (thirteen with the FMO and one year with DHHS); eighteen years of law enforcement experience (including Scarborough Police Department and the FMO); a Bachelor of Science degree in Criminology and was enrolled in a graduate degree program and a graduate certificate program; president of his local homeowners' association and helped to manage the association's budget; completed FBI-LEEDS three-week leadership training program; and six years of experience working as a volunteer firefighter. (Defs.' S.M.F. ¶ 106.)

Following the interviews and before discussion, the panel members conducted a "straw poll," with each ranking the candidates in order, and all three ranked Wardwell as first. (Defs.' S.M.F. ¶ 120.) Senior Fire Investigator Wardwell was selected for the Northern Division sergeant position. (Defs.' S.M.F. ¶ 102.)

Gardner did not have any conversations with either Thomas or Sauschuck about Roberts during the "Archer" or "Wardwell" hiring processes. (Defs.' S.M.F. ¶ 122.) Gardner was asked to provide documents and information in order to respond to Roberts's MHRC complaint but was not provided with the details or a copy of the complaint, nor did he review FMO's response to the complaint. (Defs.' S.M.F. ¶ 123.) Gardner was not aware that Roberts was alleging sex discrimination in connection with any of the hiring processes until Roberts filed his lawsuit. (Defs.' S.M.F. ¶ 124.) When Gardner called Roberts in May of 2021 to inform him that he did not get the promotion, Gardner said nothing to Roberts about his qualifications or interview

---

[13] Roberts disputes that Wardwell managed two business but did not cite a source in the record that contradicts the source cited by Defendants, therefore Wardwell's management of two businesses is deemed admitted. M.R. Civ. P. 56(h)(4).

14

skills, but instead said, "I think for me personally Mark I just like to see people that are willing to step up and be leaders and be positive." (Pl.'s Add'l S.M.F. ¶ 45.)

When a junior candidate is promoted over a senior candidate, the state requires that a memorandum justifying that decision be written. (Pl.'s Add'l S.M.F. ¶ 48.) The memorandum justifying the promotion of Wardwell was authored by Gardner and reviewed by Thomas, Gardner's supervisor, before it was forwarded to HR. (Pl.'s Add'l S.M.F. ¶ 49.) Gardner's memorandum justifying the promotion of Wardwell included multiple errors and/or omissions that resulted in Roberts's qualifications being understated even though all of the accurate information was available to Gardner at the time of his writing. (Pl.'s Add'l S.M.F. ¶ 50.) During his deposition, Gardner stated that leaving this information out of the Wardwell justification memo was inadvertent, but he acknowledged that it looks like it was done intentionally. (Pl.'s Add'l S.M.F. ¶ 51.) Gardner later drafted a revised version of the memorandum in which he noted that he personally had failed to include information from Roberts's resume in the original version. (Pl.'s Add'l S.M.F. ¶ 55.)

On or about June 9, 2021, Roberts submitted his MHRC Reply, in which he also amended his original MHRC Complaint to include a new instance of retaliation, the promotion of Wardwell over him, which was sent to the State the same day. (Pl.'s Add'l S.M.F. ¶ 54.)

## DISCUSSION

Defendants seek summary judgment in their favor on all of Roberts's remaining claims. Roberts voluntarily dismissed Counts IV and V of his Complaint in his opposition to the Defendants' Motion to Dismiss. (Order on Defs.' Mot. Dismiss May 17, 2022 6 n.1.) This court granted Defendants' Motion to Dismiss in part on May 17, 2022, dismissing Count I of the complaint on sovereign immunity grounds to the extent Roberts sought monetary or injunctive relief from Thomas in his official capacity as Maine State Fire Marshal. (*Id.* 6-7.) This court

15

also granted Defendants' Motion with respect to Count II of Roberts's Complaint and dismissed Count III to the extent Roberts seeks recovery under the Whistleblower Protection Act for Roberts's testimony to the Legislature. (*Id.* 15.) In light of the court's Order on Defendants' Motion to Dismiss, the remaining claims are: (1) Roberts's 42 U.S.C. § 1983 claim of First Amendment retaliation against Thomas in his personal capacity for damages and declaratory and injunctive relief; and (2) Roberts's claim under the WPA and MHRA against DPS. (*Id.*; *see* Compl. ¶¶ 14-20.)

## I.     Summary Judgment Standard

Summary judgment is appropriate when the parties' statements of material facts and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400 (citing M.R. Civ. P. 56(c)). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). The court must view the record facts in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897 (citations omitted). To withstand a defendant's motion for summary judgment, the plaintiff must establish a prima facie case for each element of their cause of action. *Id.*

## II.     First Amendment Retaliation

To defeat summary judgment on his 42 U.S.C. § 1983 claim of First Amendment retaliation, Roberts must establish a prima facie case on the following three elements: (1) Roberts spoke as a private citizen on a matter of public concern; (2) his interests in the speech outweigh the employer's interest in efficiency; and (3) the protected speech was a "'substantial or

16

motivating factor in the adverse employment decision.'" *McGunigle v. City of Quincy*, 835 F.3d 192, 202 (1st Cir. 2016) (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)). Even if Roberts can establish the three required elements, "'the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct.'" *Id.* (quoting *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 765-66 (1st Cir. 2010)). The court will consider each element in turn.

A. Speech as a Private Citizen on a Matter of Public Concern

Government employees have a First Amendment right to speak as citizens on matters of public concern so long as such speech does not outweigh the government's interest as an employer in the efficient delivery of public services. *O'Connor v. Steeves*, 994 F.2d 905, 912 (1st Cir. 1993) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)). Here, Thomas does not dispute that when Roberts advocated for the passage of L.D. 1480, a bill which required the expenditure of public funds to achieve its aims, Roberts was speaking as a private citizen on a matter of public concern. (Defs.' S.M.F. ¶¶ 8, 12.) Indeed, "[t]he expenditure of public funds is a matter of public concern." *Andrews v. Dep't of Env't Prot.*, 1998 ME 198, ¶ 14, 716 A.2d 212. Roberts has met his burden with respect to this element of his claim.

B. Balance of the Interests

Having established that he spoke as a citizen on a matter of public concern, Roberts must also show that his First Amendment interests outweigh any interest Thomas, as his government employer, has in "'preventing unnecessary disruptions and inefficiencies in carrying out [the FMO's] public service mission.'" *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003) (quoting *O'Connor*, 994 F.2d at 915). Thomas does not dispute that the balance weighs in Roberts's favor. There is no contention that Roberts's advocacy for L.D. 1480 impeded his

17

ability to perform his responsibilities, interfered with the efficiency and integrity in the FMO's delivery of public service, or otherwise conflicted with the FMO's ability to maintain proper discipline. *Connick v. Myers*, 461 U.S. 138, 150-151 (1983). Further, there is no suggestion that Roberts divulged any sensitive, confidential, or privileged information or made any false or misleading statements in the course of his advocacy. *Lane v. Franks*, 573 U.S. 228, 242 (2014). Having no asserted government interests to weigh against Roberts's First Amendment interest in his advocacy, the balance strikes in favor of Roberts and he has met his burden with respect to the balancing test element of his claim.

C. Substantial or Motivating Factor

After establishing that his advocacy is entitled to First Amendment protection, Roberts must now point to "some facts linking his employer's adverse employment actions to his protected conduct." *McGunigle*, 835 F.3d at 203 (citing *Guilloty Perez*, 339 F.3d at 55). Thomas does not dispute that denial of a promotion constitutes an adverse employment action in the Section 1983 First Amendment retaliation context. This court has no trouble concluding that the denial of a promotion would objectively have a chilling effect on employees' First Amendment expressions if the denial was made in retaliation for engaging in protected conduct. *See Barton v. Clancy*, 632 F.3d 9. 29 (1st Cir. 2011). Therefore, the inquiry at summary judgment is whether Roberts has identified some facts in the record to support an inference that his denial of the promotion to sergeant is connected to his advocacy for L.D. 1480. Roberts need not produce direct evidence of a causal link; circumstantial evidence will suffice. *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008). If Roberts satisfies his burden, the burden of persuasion shifts to Thomas to prove by a preponderance of the evidence that Roberts would not have been promoted even in the absence of Roberts's advocacy for L.D. 1480. *See Salmon v. Lang*, 57 F.4th 296, 309 (1st Cir. 2022).

18

The facts in the summary judgment record, viewed in the light most favorable to Roberts, are sufficient to support an inference that Thomas was upset with the impact the passage of L.D. 1480 had on the FMO's budget and that his residual negative feelings toward Roberts were a motivating factor in his decision not to promote Roberts to sergeant for the Northern Division vacancy in late 2019. It is undisputed that before the meeting between Thomas, Sauschuck, and Joyeux, Thomas made a comment about the employees at DAFS needing to keep their fingers out of a cookie jar, and it is undisputed that the "cookie jar" Thomas was referring to was the money in the FMO's accounts. (Defs.' S.M.F. ¶ 14; Pl.'s Add'l S.M.F. ¶ 6.) Before the meeting between Thomas, Sauschuck, and Joyeux, Thomas told Archer and Roberts that they should have a bake sale to fund the bill and that he would not authorize the expenditure.[14] (Pl.'s Add'l S.M.F. ¶ 9.) Roberts has produced evidence that before his L.D. 1480 advocacy, Roberts thought that Thomas was pleasant to be around, but after the bill was passed and funded, Roberts did not get a very warm feeling from Thomas. (Pl.'s Add'l S.M.F. ¶ 13.)

In addition, "'close temporal proximity between two events *may* give rise to an inference of causal connection.'" *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003) (quoting *Nethersole v. Bulger*, 287 F.3d 15, 20 (1st Cir. 2002)) (emphasis in original). A gap of a few weeks supports an inference of causal connection, but temporal gaps exceeding one year raise only a weak inference if at all. *See Nethersole*, 287 F.3d at 207 (temporal gap of "a matter of weeks" sufficient to support a causal inference); *Lewis*, 321 F.3d at 219 (temporal gap of over a year and a half, combined with other record evidence, did not support an inference of causation); *McGunigle*, 835 F.3d at 204 (temporal gap of at least two years "is too long to support an

---

[14] It is immaterial that Thomas did not have the authority to approve or deny the expenditure of FMO funds for legislation. (Defs.' S.M.F. ¶ 16.) Rather, Thomas's attitude toward the expenditure is material to whether Thomas had a motive to retaliate against Roberts.

19

inference of a causal connection between [] speech and the adverse employment actions absent other evidence of improper motive.").

Roberts's advocacy culminated in L.D. 1480 being signed into law on June 27, 2019, which is also the day Thomas made the comment about the money being gone. (Pl.'s Add'l S.M.F. ¶ 11.) Thomas wrote his justification memo selecting MacMaster for the position roughly five months later, on December 4, 2019. (Ex. 49A.)

Additionally, key facts about Thomas's attitude toward funding the bill remain disputed. Thomas's tone during the "bake sale" conversation is disputed, and his tone is material in the sense that it would help the factfinder to evaluate how deeply Thomas resented the bill's funding coming from the FMO's budget. Even after the meeting between Thomas, Sauschuck, and Joyeux during which they determined the expenditure was feasible, Thomas made a comment that "all [his] money was gone," the tone of which is disputed. (Pl.'s Add'l S.M.F. ¶ 11; Defs.' Reply S.M.F. ¶ 11.)

In the light most favorable to Roberts, the relatively close temporal proximity, combined with Thomas's undisputed attitude shift, is enough to raise an inference that Roberts's advocacy for L.D. 1480 was a substantial or motivating factor for Thomas's decision not to promote Roberts. Additionally, a genuine dispute of material fact remains regarding the nature and extent of Thomas's alleged disdain for the loss of nearly $1 million from the FMO account. Although it is undisputed that funding the bill did not cause the FMO any financial hardship, a reasonable factfinder could still conclude that having nearly $1 million less in the department account could curtail program spending and leave the department financially vulnerable without a sizeable "rainy day" fund, and this would cause the department head to harbor resentment. For the reasons above, Roberts has carried his burden for the purposes of defeating summary judgment

20

that retaliation for his advocacy for L.D. 1480 was a substantial or motivating factor in Thomas's decision not to promote him to sergeant.

D. Thomas's Burden

Having concluded that Roberts has established his prima facie case of First Amendment retaliation for purposes of summary judgment, the court now considers whether Thomas has established, as a matter of law, that he would have taken the same action regardless of Roberts's speech. *See Salmon*, 57 F.4th at 309. The purpose of the burden-shifting *"Mt. Healthy"* analysis is to ensure that "'a plaintiff . . . is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action.'" *Diaz-Bigio v. Santini*, 652 F.3d 45, 52 (1st Cir. 2011) (quoting *Acevedo Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)). However, because the defendant has the burden of persuasion and "'[b]ecause all reasonable inferences are drawn in the non-movant's favor at summary judgment, . . . a defendant cannot win at summary judgment [under the *Mt. Healthy* analysis] unless the only reasonable interpretation of the evidence is that the plaintiff would have [suffered the adverse employment event] in any event for non[-retaliatory] reasons." *Reyes-Orta v. Puerto Rico Highway & Transp. Authority*, 811 F.3d 67, 74 (1st Cir. 2016) (citation omitted).

Thomas argues that the record establishes that he would have reached the same decision in choosing not to promote Roberts into the 2019 vacancy for Northern Division sergeant because there was an expectation that the chosen candidate would reside in with Northern Division by the time they completed their probation and Roberts told the interview panel that he was not in a position to move. (Defs.' Mot. Summ. J. 14.) Thomas argues that the residency issue was the only reason Roberts was not promoted during the late 2019 selection process. (Defs.' Mot. Summ. J. 13-14.) Therefore, to establish that Thomas is entitled to judgment as a

21

matter of law, the undisputed facts must establish that the only reasonable interpretation of the summary judgment record is that Roberts was not promoted because the residency expectation disqualified him from the role.

The undisputed facts establish that there was an unwritten expectation that sergeants live in their assigned divisions, but that this was not an official policy that was strictly enforced. It is further undisputed that Roberts himself raised the issue of residency both in his cover letter and during his interview and that Roberts did not suggest any organizational or structural realignment ideas to accommodate his residence during the interview. However, because Roberts was selected for an interview despite his cover letter clearly stating that he was not able to move at the moment, a factfinder could reasonably infer that Roberts's inability to relocate would not categorically disqualify him from being considered for the promotion.

The fact that Thomas ranked Roberts first for promotion after the interview, while strong evidence that Thomas was not retaliating against Roberts, is not enough to establish Thomas's defense as a matter of law. As Roberts points out, once the candidates were ranked, Thomas could have (and did) pick any candidate out of the top three. (Pl.'s Add'l S.M.F. ¶ 14.) Further undermining the residency defense, Thomas called Roberts to tell him he wasn't getting the promotion, which, viewed in the light most favorable to Roberts, he would not have needed to do if everyone understood Roberts's residency to be disqualifying and Roberts had voluntarily removed himself from consideration. Moreover, Thomas identifies no evidence in the record to establish why MacMaster was picked for the promotion despite also not living in the Northern Division without any discussion of her plans to relocate during the hiring process.

There is a genuine dispute of fact over whether Roberts stated during his interview that he wished not to be considered for the Northern Division vacancy. This dispute is material

22

because if Roberts did remove himself from consideration during the interview, Thomas could establish as a matter of law that Roberts's non-promotion would have happened even in the absence of Roberts's protected speech.

As it stands, Thomas has not established that the only reasonable inference to be drawn from the undisputed facts is that Roberts would not have been promoted for the non-retaliatory reason of Roberts's failure to meet a residency requirement of the job. Although Thomas may have a strong defense at trial, there are triable issues of fact that are material to whether Roberts's advocacy for L.D. 1480 was a substantial or motivating factor in the decision not to promote him and whether the non-promotion would have occurred even in the absence of Robert's advocacy. Thomas's motion for summary judgment on Roberts's claim for First Amendment retaliation is denied.

E. Qualified Immunity

Thomas raises the defense of qualified immunity to Roberts's Section 1983 claim of First Amendment retaliation. State officials sued in their personal capacity for money damages under Section 1983 may raise the defense of qualified immunity. *Andrews*, 1998 ME 198, ¶ 11, 716 A.2d 212. Qualified immunity shields state officials whose actions or decisions do not violate clearly established constitutional rights that a reasonable person would have known, even if those actions violate the Constitution. *Swartz v. Sylvester*, 53 F.4th 693, 698 (1st Cir. 2022). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021)). The court notes at the outset that qualified immunity is only a defense to damages liability. *Andrews*, 1998 ME 198, ¶ 19, 716 A.2d 212. Therefore, to the extent Roberts seeks injunctive and declaratory relief on his claim for First Amendment retaliation, qualified immunity is not a defense.

23

To determine whether qualified immunity applies, courts use a two-pronged approach. *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018). The first prong asks whether the defendant violated the plaintiff's constitutional rights. *Id.* The inquiry under the second prong is whether the right allegedly violated under the first prong was "clearly established" at the time of the alleged violation. *Id.* Courts do not have to take the prongs in order and the court's analysis may begin and end with the second prong. *Id.* In this case, there is a triable issue of fact at the first prong regarding whether Thomas violated Roberts's constitutional rights. Therefore, Thomas's defense of qualified immunity must rest on the second prong alone in order to succeed at summary judgment.

There are two inquiries under the second, "clearly established," prong of the analysis. *Estate of Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022). The plaintiff has the burden to "'identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm.'" *Id.* (quoting *Conlogue*, 906 F.3d at 155). "The plaintiff must also 'show that an objectively reasonable officer would have known that his conduct violated the law.'" *Id.* (quoting *Conlogue*, 906 F.3d at 155). The plaintiff's burden requires more than simply identifying a well-established abstract right, rather, "'the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law.'" *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 12, 23 (1st Cir. 2016) (quoting *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003)). To defeat qualified immunity, the plaintiff "need not show that the complained-about conduct is the spitting image of conduct previously deemed unlawful, [but] he must show that the conduct's unlawfulness was 'apparent,' given preexisting law." *Belsito Commc'ns*, 845 F.3d at 24 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In the First Amendment retaliation context, where the analysis involves

24

weighing various factors, "only in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection." *Jordan v. Carter*, 428 F.3d 67, 75 (1st Cir. 2005).

Here, Roberts argues that the general proposition that government employees retain the right to speak as private citizens on matters of public concern so long as the speech outweighs the government's interest as an employer in efficient performance of public service is sufficient to clearly establish the right. While this is true as a general matter, the clearly established inquiry is more searching. *See Belsito Commc'ns*, 845 F.3d at 23. Roberts has the burden to identify binding authority or "a robust consensus of persuasive authority" that renders Thomas's actions clearly unlawful. *Id.* Beyond the general *Pickering* rule, Roberts does not identify any binding authority, let alone a robust consensus of persuasive authority, that is sufficiently particularized to the facts of this case to clearly establish the law. (Pl.'s Opp'n to Defs.' Mot. Summ. J. 15.)

Roberts cites only one case to support his argument that Thomas violated clearly established law when he did not choose Roberts for the promotion. (Pl.'s Opp'n to Defs.'s Mot. Summ. J. 15.) The case cited, *Archer v. Town of Houlton*, is not binding authority on this court and is of limited persuasive authority as an unreported magistrate's recommendation on a motion for summary judgment in the Federal District Court for the District of Maine. *See Archer v. Town of Houlton*, No. 00-244-B-H, 2001 WL 1057708 at *24 (D. Me. Sept. 12, 2001). While the point cited, that granting qualified immunity to government officials who can provide an after-the-fact alternative basis that does not violate constitutional rights would effectively immunize practically every official action, *id.* at *18, is well taken, it does not apply to this case. In *Archer*, the government defendants did not promote employees who had participated in union activities and the defendants did not even attempt to establish that they would not have been

promoted even in the absence of union activities. *Id.* at *15. This is why the *post hoc* rationalization that the government defendants had "legitimate reasons" was not enough to invoke qualified immunity in that case. *Id.* at *18. Here, Thomas has pointed to undisputed evidence that he would have taken the same action even in the absence of Roberts's advocacy for L.D. 1480. Although the evidence in the record, even viewed in the light most favorable to Roberts, is strong, it is not strong enough to establish Thomas's defense as a matter of law at summary judgment. But it does not follow that because a triable issue of fact remains that Thomas cannot be protected by qualified immunity.

Without particularized binding authority or a robust consensus of persuasive authority to clearly establish the right, Roberts has not overcome Thomas's invocation of qualified immunity. Even taking the facts in the light most favorable to Roberts and drawing all reasonable inferences in his favor, the record does not reveal apparent unlawfulness in Thomas's actions under preexisting law. *See Belsito Commc'ns*, 845 F.3d at 24 (citing *Anderson v. Creighton*, 483 U.S. at 640).

Roberts also has not established that an objectively reasonable officer would know that his conduct violated the law. The undisputed facts establish that the residency expectation, although insufficient on its own to establish Thomas's *Mt. Healthy* defense as a matter of law, played at least some role in Thomas's decision not to promote Roberts because residency was the reason given to Roberts for his non-promotion. On these facts, a reasonable official in Thomas's position could believe, even mistakenly, that regardless of Roberts's advocacy for L.D. 1480, the presence of the unrelated residency expectation was a lawful reason to deny him the promotion. *See Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008) (granting immunity on the basis that a reasonable official could believe that terminating an employee for reasons unrelated to the employee's speech does not violate the First Amendment).

26

Roberts has met neither requirement to show "clearly established law" for purposes of overcoming qualified immunity. For these reasons, Thomas's motion for summary judgment is granted with respect to Roberts's First Amendment retaliation claim for damages. The motion is denied with respect to Roberts's First Amendment retaliation claim for declaratory and injunctive relief.

III.   Maine Human Rights Act Retaliation & Whistleblower Protection Act

Defendant DPS seeks summary judgment on Count III of Roberts's complaint for retaliation in violation of the MHRA, 5 M.R.S. § 4633, and the WPA, 26 M.R.S. § 833. A prima facie case of retaliation under the WPA has three elements: (1) the employee engaged in activity protected by the statute; (2) the employee suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624 (quoting *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 14, 143 A.3d 1283). To defeat summary judgment, "'the employee's burden of proving a prima facie case of retaliation is relatively light, and requires only a small showing that is not onerous and is easily made.'" *Id.* (quoting *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145).

There is a causal connection between protected activity and an adverse employment action "'when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action.'" *Id.* (quoting *Brady*, 2015 ME 143, ¶ 16, 126 A.3d 1145). To determine whether there is an arguable causal nexus, any relevant evidence should be considered, including temporal proximity. *Id.* The plaintiff in a WPA retaliation case need not "'convince the court on summary judgment that [he] *was* subjected to an adverse employment decision because of [his] protected report, or even that [his] version of events is more

27

plausible.'" *Fuhrmann v. Staples Off. Superstore East, Inc.*, 2012 ME 135, ¶ 21, 58 A.3d 1083 (quoting *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 23, 974 A.2d 276). "If the evidence in the summary judgment record would allow a jury to find for the employee on each element of the employee's case, then the employer is not entitled to summary judgment." *Brady*, 2015 ME 143, ¶ 39, 126 A.3d 1145.

The prima facie case of retaliation under the MHRA and the court's analysis follows the same analytical structure for claims of retaliation under the WPA. *See Doyle v. Dep't of Hum. Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48 (establishing the three-element prima facie case of retaliation under the MHRA by using the same prima facie elements from *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me. 1991), a WPA retaliation case). In 2015, the Maine Supreme Judicial Court, sitting as the Law Court, abandoned the *McDonnell Douglas* framework when evaluating claims under the WPA at summary judgment. *Brady*, 2015 ME 143, ¶ 39, 126 A.3d 1145. Although the Law Court has not yet explicitly stated that *McDonnell Douglas* does not apply to claims of MHRA retaliation at summary judgment, the reasons the Law Court abandoned *McDonnell Douglas* at summary judgment in WPA retaliation claims apply to MHRA retaliation claims with equal force. As the Law Court explained in *Brady*, the *McDonnell Douglas* burden-shifting approach does not apply in retaliation cases because, in Maine, the prima facie case of retaliation requires a showing a causation, while the prima facie case of a Title VII discrimination claim does not. *Id.* ¶ 34.

A. Protected Conduct

For the reasons outlined above, the court's analysis for Roberts's claim of retaliation under the WPA and retaliation under the MHRA will be addressed as one, with the exception of the first element which requires consideration of whether the alleged protected conduct falls under

the respective statutory protections. DPS does not appear to dispute that Roberts can establish the first element of his prima facie case.

### 1. WPA

Maine's WPA provides that:

> No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because ... [t]he employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State.

26 M.R.S. § 833(1)(A). It is undisputed that Roberts made his complaint of sex discrimination to the MHRC, a public body, on or about February 10, 2021. *See* 26 M.R.S. § 832(4)(D); 5 M.R.S. § 4561. Based on his discussions with his friend Darcy and Tourtelotte, a factfinder could reasonably conclude that Roberts had reasonable cause to believe he was unlawfully discriminated against on the basis of sex, and therefore did not bring his complaint in bad faith. Roberts has met the first element of his prima facie case because his filing the MHRC complaint falls within the definition of activity protected by the Maine WPA.

### 2. MHRA

The MHRA provides that "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633(1). The Act's definition of "person" "includes the State and all agencies thereof." *Id.* § 4553(7). Under the Act, it is unlawful for an employer to discriminate with respect to promotion on the basis of sex or gender identity. *Id.* § 4572(1)(A).

29

It is undisputed that Roberts filed a complaint of sex and/or gender discrimination with the Maine Human Rights Commission under the MHRA. (Defs.'s S.M.F. ¶ 91; Ex. 15.) By doing so, Roberts opposed sex discrimination, illegal under the MHRA, and made a charge in an investigation under the MHRA. Therefore, Roberts engaged in protected conduct under the MHRA and has established the first element of his prima facie case for retaliation under the MHRA.

### B. Adverse Employment Action

DPS does not dispute that the denial of a promotion constitutes an adverse employment action. *See LePage v. Bath Iron Works Corp.*, 2006 ME 130, ¶ 20, 909 A.2d 629; *Tourangeau v. Nappi Distribs.*, No. 2:20-cv-12-JAW, 2022 WL 17987103 at *52 (D. Me. Dec. 29, 2022). Roberts has met the second element of his prima facie case.

### C. Causal Link

Roberts argues that DPS retaliated against him for engaging in protected conduct by denying him the promotion to Northern Division sergeant when the position was open in April 2021 and promoting Wardwell instead. DPS asserts that claims of retaliation under the MHRA follow the federal Title VII standard of "but-for" causation rather than substantial or motivating factor causation. (Defs.' Mot. Summ. J. 28 (citing *Bodman v. Maine Dep't of Health and Hum. Servs.*, 787 F.Supp.2d 89, 99 n.14 (D. Me. 2011)). However, as established above, the prima facie showing and the court's analytical approach are the same for retaliation claims under the WPA and the MHRA. The Law Court applies substantial or motivating factor causation to claims under the WPA. *See, e.g., Johnson*, 2019 ME 176, ¶ 23, 222 A.2d 624. There is no reason to apply a higher standard of causation to retaliation claims under the MHRA than to claims under the WPA when the two claims are essentially the same. *Compare* 5 M.R.S. §

30

4633(1) (establishing what constitutes unlawful retaliation under the MHRA), *with* 26 M.R.S. § 833(1) (establishing what constitutes unlawful retaliation under the WPA, which encompasses the same conduct as would constitute retaliation under the MHRA).

"In the field of employment discrimination [the Law Court] frequently adopt[s] the analysis of analogous federal law by federal courts to the extent [it] find[s] it persuasive." *Plourde v. Scott Paper Co.*, 552 A.2d 1257, 1262 (Me. 1989). Impliedly, the Law Court has not found the Title VII but-for causation requirement to be persuasive in retaliation cases because it has continued to apply substantial or motivating factor causation in retaliation cases even after the Supreme Court held that but-for causation is required in Title VII retaliation cases. *See Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (holding that but-for causation is required in Title VII retaliation cases); *Johnson*, 2019 ME 176 ¶ 23, 222 A.2d 624 (articulating substantial or motivating factor causation as the rule in retaliation cases). Therefore, the relevant standard of causation for Roberts's claim of retaliation under the WPA and the MHRA is substantial or motivating factor. Roberts's task on summary judgment is to produce some evidence on causation sufficient to raise a triable issue of fact on causation.

DPS argues that, when Gardner made the decision to promote Wardwell over Roberts, he could not have been retaliating against Roberts because Gardner was not provided with the details or a copy of the complaint and Gardner did not know that Roberts was alleging sex discrimination until this suit was filed. (Defs.' Mot. Summ. J. 21.) While it is true that one cannot retaliate against another for conduct the alleged retaliator does not know about, the record does not conclusively establish that Gardner had no knowledge of Roberts's MHRC complaint.

Gardner was asked to provide documents and information in order for DPS to respond to Roberts's MHRC complaint. (Defs.' S.M.F. ¶ 123.) While it is undisputed that Gardner was not

31

given the details or a copy of the complaint, (Defs.' S.M.F. ¶ 123,) the evidence in the light most favorable to Roberts supports an inference that Gardner could at least infer that Roberts had filed a complaint with the MHRC for some reason related to discrimination. The MHRA does not require the alleged retaliator to have knowledge of the particulars of protected conduct. *See* 5 M.R.S. § 4633(1).

It is further undisputed that when Gardner called Roberts in May of 2021 to inform him that he did not get the promotion, Gardner said, "I think for me personally Mark I just like to see people that are willing to step up and be leaders and be positive." (Pl.'s Add'l S.M.F. ¶ 45.) In the light most favorable to Roberts, a reasonable factfinder could infer that Gardner was referring to Roberts's MHRC complaint and history of opposing the hiring decisions of the FMO when he made this comment, implying that engaging in the protected conduct was not "be[ing] positive."

Additionally, the temporal proximity between Roberts's filing of the MHRC complaint and Wardwell's promotion over Roberts supports an inference of causation between the two events. Roberts filed his MHRC complaint on or around February 10, 2021. Gardner made the decision to promote Wardwell in May of 2021, while Roberts's claim with the MHRC was still pending. Temporal proximity of approximately two months, combined with other record evidence of causation, is sufficient for a plaintiff in a retaliation case to defeat summary judgment. *See Daniels*, 2012 ME 80, ¶¶ 21-22, 45 A.3d 722. Here, between the temporal proximity of the protected conduct and the adverse employment action and Gardner's comment about positivity, there is a triable issue of fact on causation.[15] As such, Roberts has established at

---

[15] The parties spend considerable space in their briefing arguing what inferences, if any, can be drawn from the differences in qualifications between Roberts and Archer. This evidence may be relevant at trial to help the factfinder evaluate causation, but it is not necessary to parse this evidence at summary judgment because, even in the absence of the evidence on qualifications, Roberts has identified sufficient evidence for a triable issue of fact on every element of his prima facie case of retaliation.

least a triable issue of fact on every element of his prima facie case of retaliation under both the

WPA and the MHRA and DPS's motion for summary judgment on this claim is denied.

The entry is:

1. Thomas's motion for summary judgment on Roberts's 42 U.S.C. § 1983 claim of First Amendment Retaliation is DENIED.
2. Thomas's motion for summary judgment on Roberts's 42 U.S.C. § 1983 claim for damages is GRANTED on the basis of qualified immunity.
3. DPS's motion for summary judgment on Roberts's claim of retaliation in violation of the WPA and MHRA is DENIED.
4. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 10/4/23

Thomas R. McKeon
Justice, Maine Superior Court

Entered on the Docket: 10/4/2023

33